UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

ANTHONY W. SUMMERVILLE, 03-A-2566,

                     Plaintiff,

-vs-                            DECISION and ORDER

EILEEN FACIUNA, JOSEPH TAN,          05-CV-6459 (CJS)
and J. BERBARY,

                     Defendants.

---

**APPEARANCES**

For Plaintiff:            Anthony W. Summerville, 03-A-2566, *pro se*
                            Gouverneur Correctional Facility
                            Box 370
                            Gouverneur, NY 13642-0370

For Defendants:       Gary M. Levine, A.A.G.
                            New York State Office of the Attorney General
                            144 Exchange Boulevard, Suite 200
                            Rochester, NY 14614

**INTRODUCTION**

**Siragusa, J.**  This is an action by pro se Plaintiff, a prison inmate, brought under 42 U.S.C. § 1983, asserting Eighth Amendment claims of inadequate medical care and inadequate conditions of confinement.  Now before the Court is Defendants' Motion for Summary Judgment. (Docket # 24.)  For the reasons set forth below, Defendants' motion is granted.

**BACKGROUND**

Unless otherwise noted, the following are the undisputed facts of this case viewed in the light most favorable to Plaintiff.  At all relevant times, Anthony Summerville

("Plaintiff") was a prison inmate in the custody of the New York State Department of Correctional Services ("DOCS"). (Am. Compl. ¶ 2.) On September 7, 2005, Plaintiff filed a Complaint against four individuals who, at all relevant times, were employed by DOCS at Collins Correctional Facility ("Collins"): Superintendent J. Berbary ("Berbary"), Jospeh Tan, M.D. ("Tan"), Nurse Elieen Faciuna ("Fucina")[1], and Sergeant Polike ("Polike"). (Compl. ¶ 3; Am. Compl. ¶¶ 4-6.)

Around 1:40 a.m. on July 14, 2005, Plaintiff awoke in distress because of what felt like an insect inside his ear. (Am. Compl. ¶ 1.) Plaintiff screamed in pain, and his cell-mate called for assistance. (*Id.*) Plaintiff spoke with a Sergeant, who directed two correction officers to escort Plaintiff to the bull pen until Nurse Fucina could see him. (*Id.*) When Nurse Fucina examined Plaintiff, she told him there was no bug in his ear and suggested that he had stuck something in his ear. (Am. Compl. ¶ 4.) Plaintiff continued to experience pain and begged Nurse Fucina to flush the bug out of his ear. (Am. Compl. ¶ 5.) Nurse Fucina refused and told the correction officers to escort Plaintiff back to his cell. (*Id.*)

Plaintiff refused to be put back in his cell. (Am. Compl. ¶ 7.) According to Plaintiff, one of the correction officers told Nurse Fucina that he might really have a problem because he refused to go back in his cell. (*Id.*) The correction officer put Plaintiff in the bull pen until he could see a doctor at Erie County Medical Center ("ECMC") via teleconference ("Telemed"). (*Id.*) Before Plaintiff could consult with the doctor, he again begged Nurse Fucina to re-examine his ear because he felt dizzy, had trouble hearing, and

---

[1]Counsel for Defendants informs the Court that the correct spelling is Eileen Fucina. (Defs.' Mem. 1.)

felt severe pain.  (Am. Compl. ¶ 8.)  Plaintiff alleges that Nurse Fucina accused him of faking his distress and refused to provide any assistance to Plaintiff.  (Am. Compl. ¶ 9.)

Nurse Fucina, however, states in her declaration that she examined Plaintiff's ear several times and made multiple attempts to get a consultation for Plaintiff.  (Fucina Decl. ¶¶ 3-7, Ex. A.)  Plaintiff's medical records show that Nurse Fucina observed and noted that his left ear drum was bulging and red.  (Fucina Decl., Ex. A.)  Furthermore, Plaintiff admits that Nurse Fucina examined his ear.  (Pl.'s Dep. 15:18-19.)  At 6:40 a.m., she gave Plaintiff Tylenol to alleviate the pain.  (Fucina Decl. ¶ 6; Tan Decl., Ex. A.)  Contrary to Plaintiff's assertions that Nurse Fucina did not consult other medical staff (Pl.'s Resp. ¶ 5), she notified the on-call physician, Dr. Bangsil, who ordered an ECMC consult via Telemed (Fucina Decl. ¶ 4; Tan Decl., Ex. A).  Nurse Fucina made four attempts to connect with ECMC via Telemed.  (Fucina Decl. ¶ 5.)[2]

Nurse Fucina, though, was unable to connect with ECMC via Telemed.  (*Id.*)  Consequently, she notified the Nurse Administrator of the connection problem.  (Fucina Decl. ¶ 7.)  At 7:10 a.m., the Nurse Administrator obtained authorization for Plaintiff's transport to ECMC.  (Fucina Decl., Ex. A.)  The Patient Referral Form notes that the reason for referral was "c/o a bug flew in his L ear while sleeping & felt something inside . . . bulging 'RED' tympanic membrane [ ] scant amount of bleeding & c/o muffled hearing from L ear.  Denies any dizziness."  (Tan Decl., Ex. A.)

The following represents Plaintiff's account of his visit to the ECMC emergency room ("ER").  (*See* Am. Compl.)  Two doctors at ECMC looked in Plaintiff's ear and said

---

[2]Plaintiff's medical records show that Nurse Fucina made requests for a video consultation through Telemed at 4:20 a.m., 4:45 a.m., 5:30 a.m., and 6:15 a.m.  (Pl.'s Resp., Attach. 2.)

they saw a bug. (Am. Compl. ¶ 19.) One of the doctors attempted to flush it out but could not. (*Id.*) The doctor said if the ear had been irrigated promptly, it would not have swollen and trapped the bug inside. (*Id.*) Correction Officer Gill ("Gill") was present for Plaintiff's examination. (*Id.*) The doctor told Gill to report back to medical staff that he was unable to remove the bug due to the swelling and that Plaintiff should be sent to an ear, nose, and throat specialist ("ENT") if he continue to experience pain, dizziness, or loss of hearing. (Am. Compl. ¶ 20.) The doctor gave Plaintiff an antibiotic to prevent infection of his ear. (Am. Compl. ¶ 19.) The doctor also stated that any complaint of hearing loss warrants referral to an ear specialist within seventy-two hours. (Am. Compl. ¶ 20.)

However, the ER physician's report, which was sent back to the prison, does not show any of the instructions Plaintiff claims were given. Rather the ER report states:

Diagnosis: Left Ear Pain

Medications/Changes: [illegible] Take As Directed

Patient Instructions: Please—Follow Up With Facility Doctor In 5 Days. Take Medication As Instructed—Return To ER For Any Concerns—Fever, Dizziness

(Pl.'s Resp., Attach. 2.)

Five days later, on July 19, 2005, Dr. Tan followed these instructions and re-examined Plaintiff's ear. (Pl.'s Resp., Attach. 2.) Plaintiff still complained that the bug in his ear impeded his hearing. (Am. Compl. ¶ 23.) Plaintiff alleges that during this examination, Dr. Tan killed a fly and said, "look Summerville, the bug jumped out of your ear." (Am. Compl. ¶ 21.) Although Plaintiff also maintains that Dr. Tan refused Plaintiff's request to see an outside physician (Am. Compl. ¶ 21), on that same day, July 19, 2005, Dr. Tan submitted a request for consultation form (Pl.'s Resp., Attach. 2). In the referral

form, Dr. Tan noted that the reason for consultation was, "pain[f]ul mass growing left ext auditory canal causing conductive hearing loss . . . initially, inmate thought it was a bug that went inside left ear [ ] no bug was recovered." (*Id.*)

On July 21, 2005, Dr. Tan's request for consultation was approved. (*Id.*) Before that consultation took place, Dr. Tan prescribed Plaintiff three different kinds of medication, and nurses checked his ear every day. (Am. Compl. ¶ 25.) The nurses always stated that they did not see anything in Plaintiff's ear. (*Id.*) On August 2, 2005, Plaintiff saw an ENT specialist, Dr. Beverly Prince ("Prince"), who removed a Japanese beetle from his ear, ordered a hearing test, and recommended a follow-up in two weeks. (Pl.'s Resp., Attach. 2.) Further, Dr. Prince noted that she was not able to get a few of the beetle's appendages out of Plaintiff's ear. (*Id.*) In accordance with Dr. Prince's instructions, Dr. Tan immediately referred Plaintiff for a hearing test. (*Id.*) Plaintiff received a hearing test later that same day. (*Id.*) The doctor performing the hearing test noted, "unreliable audiogram L ear [ ] follow up w/ Dr. Prince as ordered." (*Id.*)[3]

On August 3, 2005, the day after Plaintiff's outside consultation, Dr. Tan requested a follow-up consultation for Plaintiff, in accordance with Dr. Prince's orders. (*Id.*) On August 23, 2005, Plaintiff had his follow-up appointment with Dr. Prince. (Tan Decl., Ex. A.) In the report, Dr. Prince wrote:

> <u>Physical Exam</u>: . . . drum is somewhat swollen. There is a small remnant attached to the drum that I am not removing.

---

[3]The Court notes that Plaintiff had a prior ear exam on March 22, 2005 that showed his hearing to be within normal range. (Tan Decl. ¶ 4.)

> Assessment and Plan: The hearing test shows normal thresholds and they felt it was unreliable because there was blood. The plan is to let the remnant [of the Japanese beetle] sluff off. Keep the ear dry.
>
> Follow-up: To see the patient back in one month.

(*Id.*) Again, Dr. Tan put in a referral request for Plaintiff to have another follow-up appointment with Dr. Prince. (*Id.*) However, this request was denied on the ground that facility staff could adequately monitor Plaintiff's condition. (*Id.*) If Plaintiff's condition did not improve, then the review committee would reconsider a request for outside consultation. (*Id.*)

On October 28, 2005, Dr. Tan again requested a referral because Plaintiff continued to complain about his ear. (*Id.*) Dr. Tan wrote, "inmate still has foul smelling discharge from left ear in spite of [medications prescribed] 4 drops 4 times a day." (*Id.*) He also noted that Plaintiff "still c/o pain and inability to hear [ ] same soft tissue mass obstructing incompletely left ext auditory canal [ ] chronic otitis externa, soft tissue mass left ear . . . ." (*Id.*)

On or around November 9, 2005, Plaintiff was transferred to Wende Correctional Facility ("Wende"). (*Id.*) Per Dr. Tan's request, Plaintiff saw Dr. Prince on November 22, 2005, who reported:

> History of Present Illness: . . . He is still complaining that he can't hear and has a foul smell and it hurts.
>
> Physical Exam: The ear exam is basically normal. The drum is intact. You can see that there was use of eardrops in the past.
>
> Assessment and Plan: The patient is to keep the ear absolutely dry and we are to get a hearing test. If the hearing test is normal, there is no more concern. As far as his otalgia I can't be sure what he is talking about.

(*Id.*)  Following Dr. Prince's advice, a doctor at Wende requested a referral for Plaintiff to receive another hearing test. (*Id.*) On December 20, 2005, Plaintiff received another hearing test. (*Id.*) Although the results for his left ear were "inconsistent" and "unreliable" (Tan Decl., Ex. A), they fell within normal limits (Tan Decl. ¶ 15).

In addition to his inadequate medical treatment claim, Plaintiff alleges that his constant exposure to insects in his cell gives rise to conditions of confinement that violate the Eighth Amendment. (Am. Compl. ¶¶ 27-37.) Specifically, he alleges that from March 2005 to November 2005, he was forced to inhabit an infested cell. (Am. Compl. ¶ 28.) Plaintiff maintains that Superintendent Berbary had a responsibility to maintain sanitary conditions in Collins. (Am. Compl. ¶ 27.) However, Plaintiff insists he never saw any indications that his cell or the correction officers' area was treated by an exterminator. (*Id.*) Further, Plaintiff states that if an exterminator treated his cell, he never received a mask to protect him from the fumes. (Am. Compl. ¶ 28.) Plaintiff also alleges that the window screens had large holes that allowed bugs to come into his cell. (Am. Compl. ¶ 29.) He notes that bugs also came in through the cracks around the door and holes or cracks in the wall. (*Id.*)

Defendant Berbary states that he responded to Plaintiff's complaints of insect infestation by having the cell exterminated and ordering a new window screen. (Berbary Decl. ¶¶ 5, 8.) According to the grievance that Plaintiff filed on July 14, 2005, the day the bug flew in Plaintiff's ear, he was housed in cell OS-B-1. (Pl.'s Resp., Attach. 2.) By July 19, 2005, Plaintiff had moved to cell OS-A2-36 because he listed that cell in a grievance

filed on that date.[4] (*Id.*) On July 20, 2005, cell OS-A2-36 was sprayed by a professional exterminator. (Berbary Decl. ¶ 5.) Furthermore, on July 25, 2005, the Superintendent's Deputy sent Plaintiff a memo informing him that his cell had been exterminated. (Berbary Decl., Ex. B.)

On August 4, 2005, Plaintiff again wrote to the Superintendent complaining about the bugs in his cell. (Berbary Decl., Ex. C.) On August 8, 2005, Superintendent Berbary issued a memo ordering that a new screen be installed "ASAP" in cell 0S-A2-36. (Berbary Decl., Ex. D.) Plaintiff was sent a copy of this memo as well. (*Id.*) In his deposition, Plaintiff acknowledged that workmen came to cell OS-A2-36, inspected the screen, and determined it worked perfectly. (Pl. Dep. 32:11-19.) Furthermore, Plaintiff agreed that the screen did not need to be fixed. (*Id.*)

By Order of December 5, 2005, the Court dismissed the claims against Sergeant Polike with prejudice. (Docket # 3.) In lieu of an answer, Defendants filed a motion to dismiss all claims against Berbary and the claims against Tan and Fucina in their official capacities. (Docket # 5.) On July 10, 2006, the Court dismissed the claims against the remaining Defendants in their official capacities, but not the claims against them in their individual capacities. (Docket # 7.) By leave of the Court, Plaintiff filed an Amended Complaint. (Am. Compl.) In the Amended Complaint, Plaintiff alleges that Superintendent Berbary negligently managed the prison (Am. Compl. ¶ 4); Nurse Fucina delayed medical care and misdiagnosed Plaintiff's ailment (Am. Compl. ¶ 5); and Dr. Tan delayed

---

[4]In Plaintiff's Response to Defendants' Motion for Summary Judgment, he states that he was moved to cell OS-A2-36 in August 2005. (Pl.'s Resp. 4.) However, Plaintiff's grievance and prison records show he was housed in cell OS-A2-36 on July 20, 2005, the date of the extermination. (Pl.'s Resp., Attach. 2; Berbary Decl. ¶ 5.)

treatment, misdiagnosed Plaintiff's problem, and treated him with deliberate indifference (Am. Compl. ¶ 6).

On March 12, 2007, Defendants filed the subject motion for summary judgment. (Docket # 24.) Defendants maintain that Plaintiff's medical condition was not sufficiently serious because there is no medical evidence that it would result in death, degeneration, or extreme pain. (Defs.' Mem. 8.) Defendants also state that they were not deliberately indifferent because Plaintiff received sufficient medical treatment for all his complaints. (*Id.*) As to the conditions of confinement claim, Defendant Berbary maintains that all of Plaintiff's complaints were addressed "in an appropriate and timely fashion." (*Id.* at 11.) Furthermore, Defendants state that they were not aware of an excessive risk to Plaintiff's health or safety. (*Id.*) In any event, Defendants argue that they are entitled to qualified immunity. (*Id.* at 12.) Finally, Defendants note that Plaintiff cannot seek compensatory damages because he has not presented any evidence of physical injury as a result of Defendants' conduct. (*Id.*) Accordingly, they state that only nominal damages should be considered for any claims that survive summary judgment. (*Id.* at 15.)

Plaintiff responded by stating that Defendants failed to properly diagnose his condition, caused a delay in his treatment, and failed to treat him in a professional manner. (Pl.'s Resp.) Further Plaintiff claims that Defendants' conduct was designed to cover up Nurse Fucina's initial mistake of not seeing the Japanese beetle in Plaintiff's ear. (Pl.'s Resp. 7.) Plaintiff again states that Defendants did not exterminate his cell and did not fix his screen. (Pl.'s Resp. 5.) However, even if Defendants did exterminate his cell, Plaintiff maintains that he was exposed to toxic chemicals because he never received a mask to

protect him from the fumes. (*Id.*) Either way, he claims these conditions of confinement constitute cruel and unusual punishment. (*Id.*)

## ANALYSIS

The standard for granting summary judgment is well established. Summary judgment may not be granted unless "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). That is, the burden is on the moving party to demonstrate that the evidence creates no genuine issue of material fact. *See Amaker v. Foley*, 274 F.3d 677 (2d Cir. 2001). Where the non-moving party will bear the burden of proof at trial, "the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

Once that burden has been met, the burden then shifts to the non-moving party to demonstrate that, as to a material fact, a genuine issue exists. Fed. R. Civ. P. 56(e)(2); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. In determining whether a genuine issue exists as to a material fact, the court must view underlying facts contained in affidavits, attached exhibits, and depositions in the light most favorable to the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). Moreover, the court must draw all reasonable

inferences and resolve all ambiguities in favor of the non-moving party. *Anderson*, 477 U.S. at 248-49; *Doe v. Conn. Dep't of Pub. Safety ex rel. Lee*, 271 F.3d 38, 47 (2d Cir. 2001), *rev'd on other grounds*, *Conn. Dep't of Pub. Safety v. Doe*, 538 U.S. 1 (2003).

"Mere conclusory allegations, speculation or conjecture will not avail a party resisting summary judgment." *Conroy v. New York State Dep't of Corr. Servs.*, 333 F.3d 88, 94 (2d Cir. 2003). Rather, evidentiary proof in admissible form is required. Fed. R. Civ. P. 56(e). "[W]here there is an absence of sufficient proof as to one essential element of a claim, any factual disputes with respect to other elements of the claim are immaterial and cannot defeat a motion for summary judgment." *Salahuddin v. Goord*, 467 F.3d 263, 281 (2d Cir. 2006) (citing *Celotex*, 477 U.S. at 322-32).

Since Plaintiff is proceeding pro se, the Court must construe his submissions liberally, "to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir.1994). Furthermore, because opposing a summary judgment motion can be complicated, either the district court or the moving party must supply a pro se litigant with notice of the requirements of Rule 56. *Irby v. New York City Transit Auth.*, 262 F.3d 412, 414 (2d Cir. 2001). On October 16, 2007, the Court sent Plaintiff notice pursuant to *Irby*. (Docket # 39.)

***Plaintiff's Inadequate Medical Treatment Claims***

The Supreme Court has noted that "the Eighth Amendment's prohibition on cruel and unusual punishments encompasses the deliberate failure to treat 'a prisoner's serious illness or injury' resulting in the infliction of unnecessary pain and suffering." *Smith v. Carpenter*, 316 F.3d 178, 184 (2d Cir. 2003) (quoting *Estelle v. Gamble*, 429 U.S. 97, 105

(1976)).  However, "mere negligence in diagnosis or treatment is insufficient to state a valid Eighth Amendment claim and [ ] 'medical malpractice does not become a constitutional violation merely because the victim is a prisoner.'"  *Id.* (quoting *Estelle*, 429 U.S. at 105-06).  There are two prongs to the test for determining whether inadequate medical care rises to the level of "deliberate indifference."  *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998).  First, using an objective standard, the court must find that the alleged deprivation of care is "sufficiently serious."  *Id.*  Second, using a subjective standard, the court must find that the defendant acted with a "sufficiently culpable state of mind."  *Id.*

The proper inquiry for the objective "sufficiently serious" test is (1) whether there was an actual deprivation of adequate medical care and (2) whether the inadequacy of the care is sufficiently serious.  *Salahuddin*, 467 F.3d at 279-80.  To prove that the inadequacy of care was sufficiently serious, the prisoner must show "that his medical need was 'a condition of urgency, one that may produce death, degeneration, or extreme pain.'" *Johnson v. Wright*, 412 F.3d 398, 403 (2d Cir. 2005) (quoting *Hemmings v. Gorczyk*, 134 F.3d 104, 108 (2d Cir. 1998)).  Furthermore, "only 'deprivations denying the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation.'"  *Salahuddin*, 467 F.3d at 279 (quoting *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)).  Prison officials "cannot be found liable under the Cruel and Unusual Punishments Clause," if they acted reasonably in response to the inmate's health concern. *Id.* (finding it unreasonable to postpone prisoner's Hepatitis C treatment for five months).

Under the second prong of the test for inadequate medical care, the court must determine whether the official acted with "deliberate indifference" to the prisoner's medical needs.  *Chance*, 143 F.3d at 702.  As the Supreme Court has explained, a prisoner cannot

state a valid Eighth Amendment claim merely by alleging negligence in diagnosis or treatment. *Estelle*, 429 U.S. at 105-06. As the Court further noted, "an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." *Farmer v. Brennan*, 511 U.S. 825, 838-40 (1994) (adopting criminal law standard of subjective recklessness to determine deliberate indifference under the Eighth Amendment).

Generally, in cases involving delayed care, the Second Circuit has reserved a finding of deliberate indifference for extreme cases, such as: ignoring a life-threatening and fast-degenerating condition for three days, *Liscio v. Warren*, 901 F.2d 274, 277 (2d Cir. 1990); delaying care as a form of punishment, *Archer v. Dutcher*, 733 F.2d 14, 16-17 (2d Cir. 1984); or delaying major surgery for over two years, *Hathaway v. Coughlin*, 841 F.2d 48, 50-51 (2d Cir. 1988).

Defendants maintain that Plaintiff's condition was not sufficiently serious to meet the objective test under the Eighth Amendment. (Defs.' Mem. 8.) Even assuming, for the sake of this motion, that Plaintiff's condition was sufficiently serious, Plaintiff still has to show that he was denied adequate medical care and that the deprivation was sufficiently serious. *See Salahuddin*, 467 F.3d at 279-80 (noting that a "serious medical condition" is only one factor in determining whether the deprivation of care was sufficiently serious). Plaintiff cannot complain that he was completely denied treatment for his ear problem. Even though Tan and Fucina did not agree with Plaintiff's self-diagnosis, they agreed that there was something wrong with his ear. (*See* Fucina Decl. ¶ 3; Tan Decl., Ex. A.) The record clearly shows that Defendants did not ignore Plaintiff's complaints. (*See* Pl.'s Resp.,

Attach. 2; Tan Decl., Ex. A.) Indeed, they sent him to the emergency room and to see a specialist on several occasions. (Pl.'s Resp., Attach. 2; Tan Decl., Ex. A.) Plaintiff complains that Nurse Fucina and Dr. Tan should have seen the Japanese beetle in his ear. (Pl.'s Resp. ¶ 4.) However, the fact that they referred Plaintiff to outside physicians suggests that at most, they misdiagnosed his condition. Negligent misdiagnosis does not rise to the level of an Eighth Amendment violation. *See Estelle*, 429 U.S. at 105-06; *Smith*, 316 F.3d at 184.

Consequently, the only possible inadequacy of the care Plaintiff received was a delay in treatment or the denial of a second follow-up appointment. On July 14, 2005, Plaintiff awoke in distress around 1:40 a.m. (Am. Compl. ¶ 1) but did not get to ECMC until close to 10 a.m. (Tan Decl., Ex. A). However, the record shows that during that time, Nurse Fucina actively tried to provide Plaintiff with adequate care. (*See* Fucina Decl.; Pl.'s Resp., Attach. 2.) Nurse Fucina made multiple attempts to follow the instructions of the on-call physician to get an ECMC physician to consult with Plaintiff via Telemed. (Fucina Decl. ¶¶ 4-6.) When the Telemed attempts failed, Nurse Fucina contacted the Nurse Administrator, who arranged for Plaintiff to go directly to ECMC. (Fucina Decl. ¶ 7.) During this period between Plaintiff's initial complaint and the time he went to ECMC, Nurse Fucina examined his ear and provided him with medication to alleviate his pain. (Fucina Decl. ¶¶ 3, 6.) Furthermore, the delay of eight hours for Plaintiff to see a physician, hardly rises to the same level of seriousness as the delays in *Liscio* and *Hathaway*. *Liscio*, 901 F.2d at 277 (ignoring a life-threatening and fast-degenerating condition for three days); *Hathaway*, 841 F.2d at 50-51 (delaying major surgery for over two years).

As to the effects of this delay in treatment, Plaintiff states that one of the ER doctors told him the delay resulted in swelling that trapped the bug inside Plaintiff's ear. (Am. Compl. ¶ 19.) However, the ER doctor's report does not indicate that the bug still needed to be removed. (Tan Decl., Ex. A.) It merely states that Plaintiff was diagnosed with "left ear pain," and he should take his prescribed medications, follow up with the facility doctor in five days, and return to the ER with any concerns such as fever or dizziness. (*Id.*) Five days later, on July 19, 2005, Dr. Tan followed the ER doctor's instructions and re-examined Plaintiff. (*Id.*)

Despite Plaintiff's original allegation that he was denied access to an outside physician (Am. Compl. ¶ 21), the record clearly shows that Plaintiff was referred for several outside consultations (Pl.'s Resp., Attach. 2; Tan Decl., Ex. A). After these consultations, the facility medical staff routinely followed the instructions of the outside physicians.[5] Plaintiff also complains of the delay in getting him to an outside specialist. (Am. Compl. ¶ 25.) When Dr. Tan examined Plaintiff on July 19, 2005, he immediately put in a request for an outside consultation. (Tan Decl., Ex. A.) On July 21, 2005, the review committee approved Dr. Tan's request. (*Id.*) It's not clear from the record why Plaintiff did not get to see Dr. Prince until August 2, 2005. However, by Plaintiff's own admission, nurses checked his ear every day, and Dr. Tan prescribed him three kinds of medication for his

---

[5]The only time Dr. Tan did not follow Dr. Prince's recommendation was when he preliminarily denied Plaintiff's second follow-up appointment. (Tan Decl., Ex. A.) As a result, Plaintiff did not have a second follow-up appointment with Dr. Prince. (*Id.*) Dr. Tan based this decision on the grounds that Plaintiff's condition had clinically improved and the follow-up was not medically necessary at that time. (Tan Decl. ¶ 12.) If Plaintiff's condition did not continue to improve, Dr. Tan would reconsider sending him for another outside consultation. (Tan Decl., Ex. A.)

ear problem. (Am. Compl. ¶ 25.) A fourteen-day wait for outside consultation regarding a condition that was neither life-threatening nor fast-degenerating does not meet the sufficiently serious standard, especially when Plaintiff received treatment and monitoring throughout that period.

Similarly, the denial of a second follow-up appointment with Dr. Prince does not meet the standard for a sufficiently serious deprivation of adequate medical care. In response to Defendants' motion, Plaintiff suggests that he should have been allowed this follow-up because there were still bug legs in his ear. (Pl.'s Resp. ¶¶ 12-13.) The record shows, though, that Dr. Tan followed Dr. Prince's recommendation to let the remnants of the beetle sluff off on their own. (Tan Decl., Ex. A.)

While a delay in care may sometimes meet the "sufficiently serious" standard, in this case it does not. *See Salahuddin*, 467 F.3d at 281. Even assuming that Plaintiff's medical condition was sufficiently serious, Plaintiff has failed to show that objectively, the delay in seeing outside physicians or the denial of a second follow-up appointment constitute a sufficiently serious deprivation of adequate medical care. Plaintiff may not have received the care he wished for and Defendants may have failed to correctly diagnose his problem, but they did not deny him medical treatment or access to outside medical care. When outside physicians gave their opinions and recommendations, Dr. Tan followed them.

Moreover, Plaintiff fails to meet the subjective standard because he has not pointed to admissible evidence showing that Defendants deliberately disregarded a risk to Plaintiff's health. Indeed, far from disregarding Plaintiff's condition, Defendants sought second opinions when Plaintiff complained about his ear.

Therefore, given that Plaintiff has not met either the objective standard or the subjective standard under the Eighth Amendment, his claim for inadequate medical treatment fails.

***Plaintiff's Conditions of Confinement Claim***

To determine whether prison conditions violate the Eighth Amendment's prohibition on cruel and unusual punishment, the court must determine (1) whether the plaintiff "was 'denied the minimal civilized measure of life's necessities'" and (2) whether the defendant "acted with 'deliberate indifference' to his needs." *Channer v. Mitchell*, 43 F.3d 786, 788 (2d Cir. 1994) (quoting *Wilson*, 501 U.S. at 298-303). Deliberate indifference does not exist unless the official "knows of and disregards an excessive risk to inmate health or safety; the official must be both aware of facts from which the inference could be drawn that the substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837. The charged official must act with reckless indifference, not merely negligence. *Salahuddin*, 467 F.3d at 280.

As the Supreme Court has noted, "[i]f the pain inflicted is not formally meted out *as punishment* by the statute or the sentencing judge, some mental element must be attributed to the inflicting officer before it can qualify." *Wilson*, 501 U.S. at 301. Even if the conditions of confinement were found to be unreasonable as a matter of law, a plaintiff cannot survive summary judgment unless he can point to "record evidence creating a genuine dispute" as to the facts regarding Defendants' culpable mental state. *Salahuddin*, 467 F.3d at 282.

Plaintiff filed two complaints with the Superintendent regarding bugs in his cell. (Pl.'s Resp., Attach. 2.) The record shows that the Superintendent responded to both of these complaints and informed Plaintiff of the action taken in both instances. (Berbary Decl. ¶¶ 5, 8.) After Plaintiff's first complaint, Superintendent Berbary directed his deputy to respond and Plaintiff's cell was sprayed by an exterminator. (Berbary Decl. ¶¶ 3-5, Ex. B.) When Plaintiff filed a second complaint of bugs in his cell, Superintendent Berbary ordered that his window screen be replaced. (Berbary Decl. ¶ 8, Ex. D.) As Plaintiff admits, the workmen determined that the screen was in perfect working order and did not need to be replaced. (Pl. Dep. 32:11-19.) Throughout his papers, Plaintiff merely accuses Superintendent Berbary of acting negligently. (Am. Compl. ¶ 30; Pl.'s Resp. 5.) However, even assuming that Plaintiff did allege "deliberate indifference," Plaintiff has failed to point to any evidence suggesting that Defendant Berbary acted with reckless indifference to Plaintiff's health and safety by allowing him to be exposed to bugs.

As to Plaintiff's claim that he may have been exposed to toxic chemicals, he fails to show that he was exposed to a serious risk of harm to his health or safety. *See Warren v. Keane*, 196 F.3d 330, 333 (2d Cir. 1999) ("Objectively, a plaintiff must show that he himself is being exposed to unreasonably high levels of [chemicals]."). Plaintiff does not point to any evidence showing what he was exposed to or what the potential risk of harm was. For the subjective element, he fails to allege that Berbary acted with deliberate indifference. (Am. Compl. ¶ 4.) A defendant may be liable when the dangers of a toxic substance are well known, on the theory that a reasonable person would have known that exposure to toxic substances, such as second-hand smoke or asbestos, could violate the Eighth Amendment. *Warren v. Keane*, 196 F.3d at 333. Here Plaintiff has not presented

any evidence that he was exposed to a substance that a reasonable person would know could cause harm. While Berbary acknowledges that Plaintiff's cell received treatment for insects, he maintains that he was not aware "of an excessive risk to [P]laintiff's health or safety." (Defs.' Mem. 11.) Defendants also note that there is no evidence to support an inference that a substantial risk of serious harm existed. (*Id.* at 11-12.) Plaintiff has failed to point to any evidence to support either that he was objectively exposed to a grave risk or that Berbary acted with a sufficiently culpable state of mind. Therefore, his Eighth Amendment claim regarding conditions of confinement also fails.

*Qualified Immunity*

"If the facts as alleged would not amount to the violation of a constitutional right, the qualified-immunity inquiry is at an end, and summary judgment must be granted." *Pabon v. Wright*, 459 F.3d 241, 248 (2d Cir. 2006). Because the Court found no constitutional violation regarding Plaintiff's medical care and conditions of confinement, the Court need not address Defendants' qualified immunity claims.

## CONCLUSION

Accordingly, Defendants' Motion for Summary Judgment is granted as to Plaintiff's Eighth Amendment inadequate medical treatment claim and as to Plaintiff's Eighth Amendment conditions of confinement claim.

IT IS SO ORDERED.

Dated: August 5, 2009
       Rochester, New York     ENTER.

                              /s/ Charles J. Siragusa
                              CHARLES J. SIRAGUSA
                              United States District Judge